**Case No. 21-20323**

# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

———————————

IN THE MATTER OF: CHESAPEAKE ENERGY CORPORATION,
*Debtor.*

———————————

RDNJ TROWBRIDGE; ROBERT DUNLAP; WENDY DUNLAP

*Appellants,*

*v.*

CHESAPEAKE ENERGY CORPORATION; JAMES L. BROWN; ALICE R. BROWN;
SUESSENBACH FAMILY LIMITED PARTNERSHIP; JAMES S. SUESSENBACH; GINA M.
SUESSENBACH; MEC CLASS PLAINTIFFS,

*Appellees,*

*(Caption Continued on Inside Cover)*

———————————

On Appeal from the United States District Court
For the Southern District of Texas (Rosenthal, C.J.)
No. 21-cv-1215, No. 21-cv-1218

———————————

# BRIEF OF APPELLEE CHESAPEAKE ENERGY CORPORATION

———————————

GEORGE W. HICKS, JR.
 *Counsel of Record*
DANIEL T. DONOVAN
AARON L. NIELSON
MICHAEL D. LIEBERMAN
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue NW
Washington, DC 20004
(202) 879-5000
george.hicks@kirkland.com

*Counsel for Appellee Chesapeake Energy
Corporation*

April 27, 2022

———————————————

PENNSYLVANIA PROOF OF CLAIM LESSORS,

*Appellants,*

*v.*

CHESAPEAKE ENERGY CORPORATION; JAMES L. BROWN; ALICE R. BROWN; SUESSENBACH FAMILY LIMITED PARTNERSHIP; JAMES S. SUESSENBACH; GINA M. SUESSENBACH; MEC CLASS PLAINTIFFS,

*Appellees.*

———————————————

Consolidated with

**Case No. 21-20456**

———————————————

IN THE MATTER OF: CHESAPEAKE ENERGY CORPORATION, *Debtor.*

———————————————

LILLIAN SARNOSKY; CHARLENE WALTERS, ON BEHALF OF LYMAN WALTERS FAMILY L.P.,

*Appellants,*

*v.*

CHESAPEAKE ENERGY CORPORATION; JAMES L. BROWN; ALICE R. BROWN; SUESSENBACH FAMILY LIMITED PARTNERSHIP; JAMES S. SUESSENBACH; GINA M. SUESSENBACH; MEC CLASS PLAINTIFFS,

*Appellees.*

———————————————

## CERTIFICATE OF INTERESTED PERSONS

*In The Matter of: Chesapeake Energy Corporation*, No. 21-20323

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal:

1. Roberta Baker

2. Kimberly Barna

3. Beebe's Farm FLP

4. Kyle Bethel

5. Elizabeth Booth

6. Boyanowski FLP

7. Jeff & Melinda Buckingham

8. Cecil Family LLC

9. Cemetery Road Hunt Club, Inc.

10. Rick & Mary Clark

11. John & Vilma Clark

12. Mike & Shellene Clark

13. Robert & Wendy Dunlap

14. Endless Mountain Water Co.

15. Hatokey LLC

16. Stephen Henning

17. Jennings Partners LP

18. Richard & Denise Kuffa

19. Charles & Carol Kuffa

20. Lake Carey Investments LLC

21. Dwayne Lockburner

22. Lyman Walters FLP

23. Alan & Carol Marbaker

24. Marty McGavin

25. Paul & Tracie McGavin

26. Gail McIntyre

27. Donald Miller

28. Mills PTR LP

29. Montague Partners LP

30. Mostek Family LP

31. Rodney & Diana Mowry

32. James & Sharon Neumane

33. Sam & Deborah Noone

34. Christina Pensworth

35. Leslie Pensworth

36. Adam & Erin Petlock

37. John & Megan Phillips

38. Pickering Sisters LP

39. Poepperling Partners LP

40. John Prevost

41. Russell Prevost

42. Alessio Prizzi

43. Paul & Deborah Roman

44. R&J Partners, L.P.

45. Charlotte E. Place Trust

46. Jesse C. Place

47. Richard E. & Charlotte E. Place

48. Richard E. Place Trust

49. Placewood Resource Management, L.L.C.

50. Placewood Resources, L.P

51. William R. Ruark

52. S & C Henning FLP

53. Lillian Sarnosky

54. Stark Family LP

55. Herbert D. Steele & Leola B. Steele

56. Teetsel Family Trust

57. Timothy & Terri Tyler

58. Tim & Terri Tyler Family LP

59. RDNJ Trowbridge

60. Tyler 5 FLP

61. Chris & Lisa Vaskas

62. Charlene Walters o/b/o Lyman Walters Family L.P.

63. Raynold W. & Judith A. Wilson

64. Stephen Wintermute

65. WLR Family Partnership

66. Andrew Yanchick

67. Schnader Harrison Segal & Lewis LLP

68. Law Offices of Aaron Hovan

69. Appellants

70. Appellees

<u>s/George W. Hicks, Jr.</u>
George W. Hicks, Jr.

**STATEMENT REGARDING ORAL ARGUMENT**

Appellee Chesapeake Energy Corporation does not believe that oral argument is necessary to resolve this appeal. While the history of the dispute leading to the settlements at issue here is lengthy and complex, the legal issues presented in this appeal are straightforward. Chesapeake does not believe this Court's decisional process would be significantly aided by oral argument because the facts and legal arguments are adequately presented in the briefs and in the district court's 54-page opinion.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS.........................................................i

STATEMENT REGARDING ORAL ARGUMENT ................................................ v

TABLE OF AUTHORITIES................................................................... vii

STATEMENT OF JURISDICTION ......................................................... 1

PRELIMINARY STATEMENT................................................................. 1

STATEMENT OF THE CASE................................................................. 3

      A.     Chesapeake ......................................................................... 3

      B.     Pennsylvania Litigation................................................... 3

      C.     Chesapeake's Chapter 11 Filing and Plan............................ 7

      D.     The Three Settlements.......................................................... 8

      E.     Proceedings Below............................................................ 12

SUMMARY OF ARGUMENT................................................................. 16

ARGUMENT ................................................................................. 18

I.     Plaintiffs Have Article III Standing ............................................. 18

II.    The Courts Below Had Subject-Matter Jurisdiction .................................... 25

III.   The Settlements Comply With Rule 23 ....................................... 36

CONCLUSION ................................................................................. 43

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

## Cases

*Arnold v. Garlock, Inc.*,
   278 F.3d 426 (5th Cir. 2001)................................................................29

*Borden v. Allstate Ins. Co.*,
   589 F.3d 168 (5th Cir. 2009)...............................................................26

*Celotex Corp. v. Edwards*,
   514 U.S. 300 (1995)................................................................... 26, 29

*Feder v. Elec. Data Sys. Corp.*,
   248 F.App'x 579 (5th Cir. 2007)..........................................................16

*Frame v. City of Arlington*,
   657 F.3d 215 (5th Cir. 2011)........................................................ 22, 23

*Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*,
   527 U.S. 308 (1999)...........................................................................38

*Hall v. Variable Annuity Life Ins. Co.*,
   727 F.3d 372 (5th Cir. 2013)...............................................................23

*In re Craig's Stores of Tex., Inc.*,
   266 F.3d 388 (5th Cir. 2001)................................................. 17, 30, 35

*In re Deepwater Horizon*,
   739 F.3d 790 (5th Cir. 2014)...............................................................37

*In re Enron Corp. Sec.*,
   535 F.3d 325 (5th Cir. 2008)................................................. 30, 31, 33

*In re Galaz*,
   841 F.3d 316 (5th Cir. 2016)...............................................................36

*In re In Play Membership Golf, Inc.*,
   576 B.R. 15 (Bankr. D. Colo. 2017) ....................................................35

*In re U.S. Brass Corp.*,
   301 F.3d 296 (5th Cir. 2002)................................................. 27, 31, 34

*In re Wood*,
    825 F.2d 90 (5th Cir. 1987) ............................................................ 27, 29

*In re Zale Corp.*,
    62 F.3d 746 (5th Cir. 1995) ....................................................................29

*Kaufman Cnty. Levee Improvement Dist. No. 4 v. Mitchell*,
    116 F.2d 959 (5th Cir. 1941) ..................................................................41

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ............................................................................ 20, 21

*N.A.A.C.P. v. City of Kyle*,
    626 F.3d 233 (5th Cir. 2010) ..................................................................19

*Pacor, Inc. v. Higgins*,
    743 F.2d 984 (3rd Cir. 1984) ..................................................................29

*Phillips Petroleum Co. v. Shutts*,
    472 U.S. 797 (1985) .................................................................................37

*Protective Comm. for Indep. Stockholders of TMT Trailer Ferry
    v. Anderson*,
    390 U.S. 414 (1968) .................................................................................27

*Reed v. Gen. Motors Corp.*,
    703 F.2d 170 (5th Cir. 1983) ............................................................ 14, 40

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016) .................................................................................20

*Stern v. Marshall*,
    564 U.S. 462 (2011) .................................................................................27

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014) .................................................................................19

*TransUnion LLC v. Ramirez*,
    141 S.Ct. 2190 (2021) ...................................................................... *passim*

*Warth v. Seldin*,
    422 U.S. 490 (1975) .................................................................................20

## Statutes

28 U.S.C. §157(a) ...........................................................................27

28 U.S.C. §157(b) ...........................................................................27

28 U.S.C. §1334.............................................................. 25, 26, 36

## Rules

Fed. R. Bankr. P. 9019.....................................................................27

Fed. R. Civ. P. 23(e) ...................................................................... 38

## Other Authorities

Amended Class Action Complaint, *Brown v. Access Midstream Partners, LP*, No. 14-00591 (M.D. Pa. Aug. 22, 2014) ....................................24

Class Action Complaint, *Demchak Partners Ltd. v. Chesapeake Appalachia, LLC*, No. 13-2289 (M.D. Pa. Aug. 30, 2013)..............................24

Class Action Complaint, *Suessenbach v. Access Midstream Partners, LP*, No. 14-01197 (M.D. Pa. June 20, 2014) ......................................24

Collier on Bankruptcy (16th ed. 2022) ....................................... 26, 36, 40

Exhibit C to Class Action Complaint, *Demchak Partners Ltd. v. Chesapeake Appalachia, LLC*, No. 13-2289 (M.D. Pa. Aug. 30, 2013)......................................................................31

Newberg on Class Actions (5th ed. 2021) ........................................... 39

## STATEMENT OF JURISDICTION

The district court (Rosenthal, C.J.) entered its order approving the two class-action settlements at issue here on August 23, 2021 and entered an amended order on October 13, 2021. The bankruptcy court (Jones, C.J.) had jurisdiction under 28 U.S.C. §157 and 28 U.S.C. §1334, the district court had jurisdiction under 28 U.S.C. §1334, and this Court has jurisdiction under 28 U.S.C. §1291.

## PRELIMINARY STATEMENT

The classwide settlement agreements at issue here represent the culmination of many years of negotiation and litigation among Chesapeake, the Pennsylvania Attorney General, class counsel, and several mediators about the proper calculation of oil-and-gas royalties. The settlements resolve the claims of approximately 23,000 Pennsylvania landowners, providing them with backward-looking monetary relief for alleged miscalculation of royalties and forward-looking injunctive relief that gives them a right to choose how their royalties will be calculated in the future. With these settlements, Chesapeake will achieve its overarching goal of resetting and enhancing its relationship with Pennsylvania landowners to ensure a mutually productive and transparent future.

Standing in the way of final approval are just two individual objectors (together, "Objectors"). Objectors seek to derail the settlements not by arguing that the relief they provide is inadequate or that their terms are somehow unfair, but

principally by raising jurisdictional and procedural arguments about Article III and Rule 23.  It is not even clear what Objectors hope to achieve by raising such arguments, as accepting many of them would lead to *less* relief for the class than what these settlements achieved.  For example, Objectors' argument that most class members lack Article III standing would seem to foreclose the possibility of backward-looking relief for those class members.  Thankfully for the class, Objectors' arguments are uniformly meritless and have correctly been rejected four times already—twice by Chief Judge Jones on the bankruptcy court and twice by Chief Judge Rosenthal on the district court.

Chesapeake joins the arguments set forth in the briefs filed by the two settlement classes, which amply demonstrate why the settlements represent a substantial and favorable outcome for the classes and easily satisfy Rule 23's requirement that they be fair, reasonable, and adequate, as well as all other applicable requirements.  Chesapeake writes separately to address Objectors' jurisdictional arguments and to provide its unique perspective as the reorganized debtor in the bankruptcy proceedings and the only party to both settlements at issue here and a separate settlement with the Pennsylvania Attorney General.  These settlements will provide immediate and long-lasting benefits to members of both classes and successfully resolve more than eight years of negotiation and litigation.  This Court should affirm the decision below.

## STATEMENT OF THE CASE

### A.    Chesapeake

Chesapeake Energy Corporation is an energy exploration and development company headquartered in Oklahoma City, Oklahoma.  The company, operating through various subsidiaries,[1] engages in oil and gas drilling throughout the United States, including in Pennsylvania, which is part of the Marcellus Shale, one of the nation's most significant gas fields.  ROA.1507-1508.  Chesapeake is one of the largest leaseholders in the Marcellus Shale play.  ROA.1508.  Leases in the Marcellus Shale play can be particularly significant for energy companies because of their proximity to East Coast natural gas markets.  ROA.1508.  Like other energy companies, Chesapeake typically does not own the property on which it performs drilling operations or other exploration.  Instead, Chesapeake enters into leasing contracts with landowners, who lease property to Chesapeake in exchange for royalty payments.

### B.    Pennsylvania Litigation

In 2013 and 2014, certain Pennsylvania landowners who leased property to Chesapeake filed lawsuits alleging that Chesapeake underpaid royalties due under

---

[1] One of those subsidiaries is Chesapeake Appalachia, LLC, which holds Chesapeake's interests in leases in Pennsylvania.  Here, the term "Chesapeake" includes both Chesapeake Energy Corp. and its relevant operating subsidiaries.

the terms of their leases.  In 2015, the Pennsylvania Attorney General also brought suit against Chesapeake.  The details of these lawsuits are as follows.

**The _Demchak_ litigation**:  The *Demchak* plaintiffs—from *Demchak Partners Ltd., et al., v. Chesapeake Appalachia, LLC*, No. 13-2289 (M.D. Pa. 2013)—have entered into oil-and-gas leases with Chesapeake.  These lease contracts include a "Market Enhancement Clause" or "Ready for Sale or Use Clause" (together, "MEC").  These clauses specify which post-production costs—*e.g.*, the costs of gathering, compressing, treating, dehydrating, processing, transporting, or transmitting gas, ROA.2891—that Chesapeake may deduct before calculating royalty payments.  In particular, the MEC clauses prohibit Chesapeake from deducting post-production costs incurred to transform gas into marketable form, but allow Chesapeake to deduct post-production costs incurred after the gas is marketable if they enhance the value of the marketable gas.  ROA.2891.

The *Demchak* plaintiffs sued on behalf of a putative class of oil-and-gas lessors in the Middle District of Pennsylvania whose leases contain MEC clauses. These plaintiffs alleged that Chesapeake wrongly deducted costs for "gathering, dehydrating, and compressing gas to meet the quality and pressure specifications of the interstate pipeline into which it is delivered." ROA.1823.  This was improper, the *Demchak* plaintiffs contended, because "the gas was not in marketable form until it entered the interstate pipeline." ROA.2767.  Chesapeake's position, by contrast,

has always been that gas is in "marketable form" at the well, meaning that for purposes of royalties, the company may properly take deductions for both gathering costs and transportation costs provided they enhance the value. ROA.2629.

Before the lawsuit was filed, the *Demchak* plaintiffs and Chesapeake had already participated in extensive settlement discussions and, with the assistance of a retired federal judge serving as a mediator, had reached a classwide settlement agreement. ROA.2891. As ultimately amended by the parties, the settlement would have provided class members with approximately $17 million and modified the terms of the MEC clauses in the class members' leases by obligating Chesapeake to "bear 34 percent of future post-production costs." ROA.2324. The *Demchak* plaintiffs moved for preliminary approval of the proposed amended class settlement on August 31, 2013, which Judge Mannion granted on September 30, 2015. *See* ROA.2323-2324; *see also* ROA.2350. As part of the court's preliminary approval order, notice of the proposed settlement was sent to putative class members, the vast majority of whom opted to proceed within the class. ROA.2479. As explained below, however, this proposed settlement did not obtain final approval before Chesapeake petitioned for Chapter 11 relief.

**The *Brown-Suessenbach* Litigation**: The *Brown-Suessenbach* plaintiffs— from *Brown v. Access Midstream Partners, LP*, No. 14-00591 (M.D. Pa. 2014) and *Suessenbach v. Access Midstream Partners, LP*, No. 14-01197 (M.D. Pa. 2014)—

are also parties to oil-and-gas leases with Chesapeake in Pennsylvania. Unlike the *Demchak* plaintiffs, however, their leases do not include MEC provisions.

In 2014, the *Brown* plaintiffs sued Chesapeake in the Middle District of Pennsylvania on behalf of a putative class of Pennsylvania oil and gas lessors. ROA.2892. A few months later, the *Suessenbach* plaintiffs filed a similar lawsuit, also in the Middle District of Pennsylvania. ROA.2892. Both sets of plaintiffs alleged that Chesapeake improperly inflated post-production costs before deducting them, resulting in royalty underpayments. ROA.2892. They alleged, among other things, violations of the Racketeer Influenced and Corrupt Organizations Act, unjust enrichment, and conspiracy. ROA.2892. Chesapeake disputed the allegations.

Judge Mannion consolidated discovery in *Brown* and *Suessenbach*. ROA.1887. Afterwards, the *Brown-Suessenbach* plaintiffs and Chesapeake agreed to mediation with retired-Judge Cahn and John Perry (a renowned oil-and-gas mediator) throughout 2016 and 2017. ROA.2848. Working with the mediators, the parties agreed to a proposed class settlement that would have provided class members with $7.75 million and modified the leases by giving the class members the option of choosing between two formulas for future calculation of royalties. ROA.2894. Chesapeake and the *Brown-Suessenbach* plaintiffs jointly moved for preliminary approval of the proposed settlement, but Judge Mannion had not yet acted when Chesapeake petitioned for Chapter 11 relief.

**The Attorney General Litigation**: In late 2015, the Pennsylvania Attorney General brought suit against Chesapeake in the Bradford County, Pennsylvania Court of Common Pleas.  ROA.1295.  The Attorney General alleged that Chesapeake violated Pennsylvania law through inflated prices, unfair leasing practices, improper deductions, and an undisclosed market allocation agreement. ROA.1295.  Chesapeake disputed the allegations.  The parties litigated the issues for several years, and the Pennsylvania Supreme Court was considering an appeal when Chesapeake petitioned for Chapter 11 relief.  ROA.1824.

### C.    Chesapeake's Chapter 11 Filing and Plan

On June 28, 2020 (the "Petition Date"), Chesapeake sought relief under Chapter 11 in the Bankruptcy Court of the Southern District of Texas.  ROA.1295, 2892.  The automatic stay halted the *Demchak*, *Brown*, *Suessenbach*, and Pennsylvania Attorney General lawsuits, and it precluded final approval of any of the settlements.  ROA.2893.  The matter was assigned to Chief Bankruptcy Judge David R. Jones, who set a deadline of October 30, 2020 for filing proofs of claim that arose before the petition date.  ROA.152.  Most leaseholders did not file proofs of claim, and no proofs of claim were filed on behalf of the putative *Demchak* and *Brown-Suessenbach* classes.  ROA.2890.  However, 161 proofs of claim were filed by individual Pennsylvania leaseholders within those putative classes.  ROA.2893.

About six months later, the Court confirmed Chesapeake's Fifth Amended Joint Chapter 11 Plan of Reorganization. ROA.1073-1218. Under the Plan, Chesapeake's leases in Pennsylvania rode through unimpaired; the Plan provided that the leases "shall remain in full force and effect in accordance with the terms of the granting instruments or other governing documents." ROA.648. The Plan rejected the pending pre-petition settlement agreements in the *Demchak* and *Brown-Suessenbach* cases and discharged various claims against Chesapeake. ROA.634-638, 649-650, 658. The Plan provided, however, that Chesapeake and the bankruptcy court may allow late-filed claims. Specifically, the Plan stated that "any and all Proofs of Claim Filed after the Claims Bar Date shall be deemed disallowed and expunged as of the Effective Date," "[e]xcept … as agreed to by the Reorganized Debtors" or "unless such late Proof of Claim has been deemed timely Filed by a Final Order or otherwise allowed by order of the Bankruptcy Court." ROA.658.

### D.    The Three Settlements

From the outset of Chesapeake's Chapter 11 proceedings, the parties to the foregoing cases engaged in renewed settlement discussions. On February 9, 2021, Chesapeake and the Pennsylvania Attorney General entered into a settlement. On March 4, 2021, Chesapeake entered into settlements with the *Demchak* plaintiffs and the *Brown-Suessenbach* plaintiffs. Together, these settlements represent global resolution of Chesapeake's long-running royalty-related litigation and disputes in

Pennsylvania. The settlements, which are described in more detail below, will provide royalty owners (a) an immediate benefit from settlement payments and (b) the ability to select the method by which their royalties are calculated going forward, thus resolving the root cause of the royalty disputes. The settlements will also position Chesapeake and the Pennsylvania leaseholders for continued growth and long-term mutual success.

**The Pennsylvania Attorney General Settlement**: In exchange for a release of the Commonwealth's claims, Chesapeake agreed to pay $5,300,000 for the Commonwealth to distribute to landowners who opt into the settlement and $350,000 for reimbursement of litigation costs. *See* ROA.1315, 1320. Chesapeake also agreed not to use the MEC provision in future leases and to offer landowners who opt into the settlement the opportunity to have royalties paid at the higher of two prices: (1) the "In-Basin Price Without Post-Production Deductions," which is the price at the wellhead as determined by a pre-selected index, or (2) the "Netback Price," which is calculated after post-production cost deductions. ROA.1318-1319.[2] This settlement is not at issue in this appeal.

---

[2] In particular, the in-basin index price is the weighted average price of (a) 50% of the Leidy Hub monthly (first of the month) index price ($/MMBtu) as reported in *Inside FERC's Gas Market Report*, and (b) 50% of the TGP Zone 4-300 Leg monthly (first of the month) index price ($/MMBtu) as reported in *Inside FERC's Gas Market Report*. ROA.1317. By contrast, the settlement defines the netback price as "the weighted average sales price a Chesapeake entity received for its production month sales to third parties minus a proportionate share (net revenue interest share) of the

**The MEC Settlement**: In exchange for a release of the MEC class members' claims, Chesapeake agreed to pay $5,000,000 to be distributed to the class (after deduction of attorneys' fees), as well as to cover all administrative costs associated with the settlement.  *See* ROA.1337-1338.  Chesapeake also agreed that going forward, class members may choose to have their royalties calculated each month based on the higher of the in-basin index or netback price.  ROA.2825; *see also* ROA.1339.   Thus, if Chesapeake transports gas and, after making allowed deductions, receives prices higher than the in-basin index price, the landowner will be paid royalties based on the higher price.  The MEC Settlement also precludes Chesapeake from deducting from its royalty obligations gas "used as fuel, lost, or otherwise unaccounted for," precludes or limits various deductions for marketing fees and third-party services or operations, and precludes Chesapeake from carrying a negative balance forward from any months in which costs exceed sale prices. ROA.1339-1340.

**The Non-MEC Settlement**: In exchange for a release of the non-MEC class members' claims, Chesapeake agreed to pay $1,250,000 to be distributed to the class (after deduction of attorneys' fees), as well as administrative costs.  ROA.1389, 1397.  The Non-MEC Settlement also allows class members to "choose how to have

---

Post-Production Costs that Chesapeake incurred and any applicable and properly-calculated state severance taxes."  ROA.1319.

their royalties calculated going forward, using either the in-basin index or netback price," but "they can only make their election once, not each month."  ROA.2825; *see also* ROA.1399-1340.

Together, the Pennsylvania AG Settlement, MEC Settlement, and Non-MEC Settlement resolve the claims of approximately 23,000 Pennsylvania landowners and those of the Commonwealth itself.  ROA.2911.  These settlements, moreover, are highly beneficial for class members.  The settlements provide a combined $11.55 million in backward-looking monetary relief and provide extremely valuable forward-looking relief by allowing landowners to choose between two methods of calculating royalties on a go-forward basis or, for the MEC class, to automatically receive the higher-value method each month.  The value of that option is borne out by experience, historical data, and expert testimony about the future.  Chesapeake began implementing the MEC settlement's pricing methodology with the April 2021 revenue distribution for February 2021 production.  From April to June 2021, that new methodology resulted in $2.8 million more in royalty payments to MEC class members than Chesapeake's previous methodology would have.  ROA.2706.  Chesapeake also conducted a historical analysis demonstrating that MEC class members would have received an additional $34.4 million in royalty payments had this methodology been implemented in January 2017.  ROA.2704-2705.  The settling parties' expert testimony—which was accepted by the district court after a

battle of the experts—estimated that, going forward, the new method of calculation

has a ten-year value between $65,980,218 and $86,974,280.  ROA.2852.

### E.    Proceedings Below

Chesapeake sought preliminary approval of the three settlements in the

bankruptcy court.  ROA.1288.  The "Proof of Claim Lessors"—a group of

Pennsylvania landowners who filed proofs of claim in the bankruptcy court—

opposed Chesapeake's motion for preliminary approval of the class settlements.

ROA.1444.[3]  Chief Judge Jones reviewed the class settlement and heard from

Chesapeake, counsel for the named plaintiffs, and the Proof of Claim Lessors during

an oral hearing.  ROA.1565.  Concluding that the court had jurisdiction and that the

settlements were "in the best interests of the Debtors' estates, their creditors, and

other parties in interest," Chief Judge Jones overruled the Proof of Claim Lessors'

objection and preliminarily approved the settlements, preliminarily certified

settlement classes, and approved the form and manner of class notice.  ROA.1627-

1628.  Out of an abundance of caution, Chief Judge Jones concluded that an Article

---

[3] Some of these lessors are parties to what the opening brief calls the Wyoming County Landowners Group Lease.  Br. for Appellants at 7; *see also* ROA.1538-1539. The Proof of Claim Lessors represented "before the Middle District of Pennsylvania … that each Wyoming County lease contains a market-enhancement clause that 'mirrors one of the example' market-enhancement clauses 'in the class notice.'"  ROA.2836.

III court should make the final determinations regarding class certification and settlement approval. *See* ROA.1619-1620.

On appeal to the district court, Chief Judge Rosenthal—after considering additional briefing from the parties and holding another oral hearing—affirmed preliminary approval of the settlements, explaining that "[t]he bankruptcy court did not err by preliminarily finding the settlement terms fair, reasonable, and adequate based on the current record." ROA.1842. Chief Judge Rosenthal stressed, *inter alia*, that "[a] similar class settlement was preliminarily approved by the Middle District of Pennsylvania before Chesapeake declared bankruptcy," and that "[t]he record shows that the class settlements are the most practical vehicle for recovery for most of the class members." ROA.1840. Chief Judge Rosenthal also noted that "the Pennsylvania Attorney General," who opposed the MEC Settlement in the Middle District of Pennsylvania, "now approves of the class settlement" ROA.1842.

The Proof of Claim Lessors appealed Chief Judge Rosenthal's affirmance of the preliminary approval; that appeal was docketed as No. 21-20323. Chief Judge Rosenthal denied a stay pending appeal, explaining that the Proof of Claim Lessors had "not shown that their appeal [was] likely to be successful," nor that "they will be harmed" by preliminary approval given that they could opt-out of the settlement class or reassert their objections at the final confirmation hearing. ROA.2444-2447.

In contrast, she explained, "other interested parties will be substantially injured by the delay of this interlocutory appeal."   ROA.2447.

Upon receiving notification of the proposed class settlements, roughly 3% of class members opted out of the MEC Settlement, and less than 1% of class members opted out of the Non-MEC Settlement.   ROA.2641.   Two putative class members objected: Lillian Sarnosky (a member of the MEC Settlement Class) and Charlene Walters (a member of the Non-MEC Settlement Class).   ROA.2494-2495.   The Proof of Claim Lessors also objected to the opt-out provisions.   ROA.2448.

Chief Judge Rosenthal held a final approval hearing on July 27, 2021. ROA.2945.   On August 23, 2021, Chief Judge Rosenthal granted final approval to the two class settlements in a thorough, 54-page decision.   ROA.2820.   Chief Judge Rosenthal addressed the various objections and explained why they failed.   Among other things, she explained that the bankruptcy court had jurisdiction over the settlements, ROA.2829-2831, that the named plaintiffs have standing, ROA.2832, that the dispute was not moot, ROA.2832, that each of the Rule 23(a) and (b) factors was satisfied, ROA.2832-2846, and that the settlements satisfy the requirements of Rule 23(e) and the factors from *Reed v. General Motors Corp.*, 703 F.2d 170, 172 (5th Cir. 1983).   Indeed, "ample record evidence shows that the class has been ably and diligently represented, in a case filled with legal and factual complexities." ROA.2846.

14

Chief Justice Rosenthal also rejected the Proof of Claim Lessors' challenge to the settlement notices, concluding that "[t]he notice sent to the absent MEC and Non-MEC class members was the best notice practicable under the circumstances, as required under Rule 23(e)(1)," and that the opt-out procedures were "not unduly burdensome," including for those plaintiffs who opted out of the earlier, proposed *Demchak* settlement in the Middle District of Pennsylvania. ROA.2927-2928, 2933. She also concluded that the settlements' provisions for attorney's fees were appropriate given the reasonableness of the sums requested by named plaintiffs' counsel for years of work and the challenging issues they addressed. ROA.2936-2940.

Sarnosky and Walters appealed Chief Judge Rosenthal's final approval order to this Court; that appeal was docketed as No. 21-20456. The Proof of Claim Lessors did not appeal from the final approval order. At Appellants' request, this Court consolidated the Proof of Claim Lessors' appeal from the preliminary approval order with Sarnosky and Walters' appeal from the final approval order.[4]

---

[4]    It is not clear whether the opening brief was filed on behalf of only Sarnosky and Walters, or whether it was also filed on behalf of some of the Proof of Claim Lessors. Because the Proof of Claim Lessors did not appeal from the final approval order, and because any appeal from the preliminary appeal order is now moot, *see infra*, Sarnosky and Walters are the only remaining objectors. Moreover, "[m]ost of" the Proof of Claim Lessors opted out of the settlements, ROA.2949, and "only class members have standing to object to a settlement." *See, e.g.*, *Feder v. Elec.*

## SUMMARY OF ARGUMENT

**I.** The named plaintiffs have Article III standing. Indeed, they have alleged the most obvious and straightforward type of Article III injury: monetary harm. Their allegations encompass (1) pre-discharge monetary harm from underpayment of royalties; (2) post-discharge, pre-settlement monetary harm from underpayment of royalties; and (3) imminent, future monetary harm from underpayment of royalties. Objectors' contention that plaintiffs do not have an injury in fact because they did not timely file proofs of claim is relevant only to the first category of alleged harm, so it would not undermine plaintiffs' standing even if it were legally sound. But it is manifestly unsound and confuses the injury-in-fact requirement with the plaintiffs' ultimate right to relief. The named plaintiffs' failure to timely file proofs of claim may have made it more difficult (though not impossible) for them to obtain relief (absent the settlement), but it did not make their alleged pre-discharge injuries disappear. They suffered alleged monetary harm in the past and would continue to suffer that alleged harm going forward if the settlements are not approved. They therefore have Article III standing.

**II.** The courts below had both "arising in" and "related to" bankruptcy jurisdiction over the settlement proceedings. With respect to "arising in"

---

*Data Sys. Corp.*, 248 F.App'x 579, 580 (5th Cir. 2007). In all events, nothing about this appeal turns on the number of objectors.

jurisdiction, the settlement agreements definitively resolve claims filed in the bankruptcy case. While the named plaintiffs did not file proofs of claim, 161 members of the classes did file proofs of claim, and the settlement agreements will definitively resolve those claims for claimants who do not opt out. These proceedings are therefore core proceedings within the bankruptcy court's and district court's "arising in" jurisdiction. With respect to "related to" jurisdiction, Chief Judge Rosenthal correctly held that these proceedings satisfy all three factors this Court set forth in *In re Craig's Stores of Texas, Inc.*, 266 F.3d 388 (5th Cir. 2001), for post-confirmation "related to" jurisdiction, as well as several other factors that bankruptcy and district courts have treated as relevant. The proceedings here are not the kind of wholly post-confirmation proceedings that fall outside the courts' "related to" jurisdiction; rather, they involve primary conduct that predates the bankruptcy, they resolve litigation initiated before the bankruptcy, and they cannot be conducted without reference to the Plan and its effect on class members and other unsecured creditors. Objectors entirely ignore the *Craig's Stores* factors, instead seeming to suggest that bankruptcy courts and district courts have *no* post-confirmation "related to" jurisdiction, which simply is not the law. Under either jurisdictional prong, the courts below had subject-matter jurisdiction.

**III.** Both settlements comply with Rule 23 for the reasons set forth in the briefs filed by the MEC and Non-MEC classes. These settlements, together with a

separate settlement with the Pennsylvania Attorney General, resolve more than eight years of litigation over alleged oil-and-gas royalty underpayments and effectuate Chesapeake's overarching goal of resetting and enhancing its relationship with Pennsylvania landowners and regulators. While the settlements offer less immediate monetary relief than the proposed, pre-bankruptcy settlements in the *Demchak* and *Brown-Suessenbach* cases, that is explained by Chesapeake's intervening bankruptcy, and it is entirely offset by the forward-looking relief the settlements provide. Indeed, while the Pennsylvania Attorney General opposed the *Demchak* settlement, that office supports the settlements here. In light of the benefits the settlements provide to class members, the disputes the settlements finally resolve, and the "rigorous, hard-fought negotiations conducted at arm's length" from which the settlements emerged, ROA.2915, Chief Judge Rosenthal correctly approved the settlements, and her decision should be affirmed.

## ARGUMENT

### I.     Plaintiffs Have Article III Standing.

Objectors contend that the named plaintiffs lack a concrete injury-in-fact sufficient to support Article III standing because they did not timely file proofs of claim in the bankruptcy court. That argument is meritless. Each of the named plaintiffs alleged the "most obvious" type of Article III injury: monetary harm. *TransUnion LLC v. Ramirez*, 141 S.Ct. 2190, 2204 (2021). Indeed, the named

plaintiffs' allegations encompass three distinct buckets of monetary harm—all resulting from Chesapeake's purported underpayment of royalties—only one of which is even arguably (but not actually) affected by their failure to timely file proofs of claim. In particular, the allegations encompass (1) pre-discharge monetary harm; (2) post-discharge, pre-settlement monetary harm; and (3) imminent future monetary harm. The fact that named plaintiffs did not timely file proofs of claim may have made it more difficult for them to obtain a *remedy* for the first category of alleged injuries (absent the settlement), but it did not make those claimed *injuries* disappear, and it had no effect on the other (post-discharge) injuries they alleged. The named plaintiffs therefore readily satisfy the injury-in-fact requirement.[5]

Article III of the Constitution "confines the federal judicial power to the resolution of 'Cases' and 'Controversies.'" *Id.* at 2203. The doctrine of standing gives meaning to the "case or controversy" requirement "by identifying those disputes which are appropriately resolved through the judicial process," in contrast to generalized grievances that are properly directed to the political branches. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 (2014). To establish Article III standing, "a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the

---

[5] This court examines standing *de novo*. *N.A.A.C.P. v. City of Kyle*, 626 F.3d 233, 236 (5th Cir. 2010).

defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion*, 141 S.Ct. at 2203.

The Objectors dispute only the first of these elements, arguing that the named plaintiffs "have no concrete, particularized injury." Br. for Appellants at 34; *see id.* at 35 ("[T]here was nothing in it for the named plaintiffs."). The injury-in-fact requirement helps to ensure that the plaintiff has a "personal stake in the outcome of the controversy." *Warth v. Seldin*, 422 U.S. 490, 498-99 (1975). To establish injury in fact, a plaintiff must show that he suffered "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). While the injury-in-fact inquiry can be complicated when a plaintiff alleges only intangible harms, "[i]f a defendant has caused … monetary injury to the plaintiff, the plaintiff has suffered a concrete injury in fact under Article III." *TransUnion*, 141 S.Ct. at 2204.

The injury in fact here is as straightforward as they come: Plaintiffs in the MEC class and non-MEC class (including the named plaintiffs) alleged that they have suffered, and will continue to suffer, monetary harm because of Chesapeake's alleged underpayment of royalties. In short, they claim that Chesapeake owes them money and will owe them more money in the future. *See* MEC Settlement, ROA.1330 ("Plaintiffs allege in *Demchak* that Chesapeake, among other allegations,

underpaid Royalties by deducting Post-Production Costs from Royalties."); Non-MEC Settlement, ROA.1390 ("Plaintiffs allege in *Brown* and *Suessenbach* that Chesapeake underpaid Royalties by deducting inflated Post-Production Costs from royalties.").  These alleged pocketbook injuries plainly satisfy the injury-in-fact requirement.  *See TransUnion*, 141 S.Ct. at 2204; *see also, e.g.*, *Lujan*, 504 U.S. at 560 (injury-in-fact can be "actual *or imminent*" (emphasis added)).

Objectors appear to believe that these injuries somehow disappeared when the named plaintiffs failed to timely file proofs of claim in the bankruptcy court; that is the crux of their entire standing argument.  *See* Br. for Appellants at 35 (arguing that "[b]ecause the named plaintiffs never filed proofs of claim … , their claims were released and discharged, leaving no dispute between named plaintiffs and Chesapeake to provide a basis for Article III standing.").  As an initial matter, the failure to timely file proofs of claim would only affect the named plaintiffs' ability to recover damages for their *pre-discharge* injuries, with no impact on their allegedly ongoing *post-discharge* injuries, which independently suffice for standing.  *See infra*.  But in all events, Objectors' argument with respect to pre-discharge injuries is flawed as a matter of fact and as a matter of law.

To begin with, the named plaintiffs' failure to timely file proofs of claim does not, as matter of fact, foreclose them from pursuing relief for their pre-discharge injuries.  Although the claims bar date has passed, the Plan provides both the

Bankruptcy Court and Chesapeake with authority to allow late-filed claims. *See* ROA.658 ("Except as otherwise provided herein or as agreed to by the Reorganized Debtors, any and all Proofs of Claim Filed after the Claims Bar Date shall be deemed disallowed and expunged as of the Effective Date … unless such late Proof of Claim has been deemed timely Filed by a Final Order or otherwise allowed by order of the Bankruptcy Court."). Accordingly, the class plaintiffs are not foreclosed from filing late proofs of claim and recovering for their pre-discharge injuries.

But even accepting Objectors' faulty factual premise that the named plaintiffs' failure to timely file proofs of claim forecloses them from obtaining relief on the merits for pre-discharge harms, that would not deprive them of standing. Objectors' contrary argument confuses the injury-in-fact requirement with the plaintiffs' ultimate right to relief. The unavailability of a judicial remedy does not make an injury in fact disappear or otherwise deprive a plaintiff of standing. An injury in fact is just that—an injury *in fact*—and the fact of injury is not altered by the availability *vel non* of a legal remedy for that injury. For that reason, courts in countless other contexts have recognized that the lack of a viable cause of action has no bearing on an injured party's Article III standing. For example, plaintiffs whose claims are time-barred do not lose their injury in fact or their Article III standing as a result. *See, e.g.*, *Frame v. City of Arlington*, 657 F.3d 215, 236 (5th Cir. 2011) (en banc) (holding that plaintiffs had standing but their claims might be time-barred). Such

cases are dismissed for failure to state a claim under Rule 12(b)(6) or on summary judgment, not for lack of jurisdiction under Rule 12(b)(1). *See id.* at 240; *see also Hall v. Variable Annuity Life Ins. Co.*, 727 F.3d 372, 373 (5th Cir. 2013) (affirming 12(b)(6) dismissal because statute of repose extinguished plaintiffs' claim). Simply put, "an injury in law is not an injury in fact," *TransUnion*, 141 S.Ct. at 2205, and the fact that the class plaintiffs might have been hampered in obtaining a legal remedy for their pre-confirmation injuries because they did not timely file proofs of claim does not mean that their injuries ceased to exist.

Regardless, assuming *arguendo* that the named plaintiffs were in fact foreclosed from recovering on their pre-discharge royalty claims, and that the named plaintiffs thus could no longer claim injury from pre-discharge royalty underpayments, their allegations also encompass injuries from *post-discharge, pre-settlement* royalty payments, which are unaffected by the discharge and provide an independent basis for standing. The Plan was confirmed on February 9, 2021, which was the discharge date. The MEC and non-MEC settlements do not become final— and therefore the agreed-upon amendments to the lease terms will not take effect— until this Court affirms the judgment below and any petitions for rehearing and/or certiorari are finally resolved. *See* ROA.1333 (§1.12); ROA.1336-37 (§1.38); ROA.1393 (§§1.11, 1.13). In the meantime, because all gas leases and royalty obligations rode through the bankruptcy unimpaired, ROA.648, and because

Chesapeake has continued to extract resources and pay royalties to class members, class members can continue to claim injuries inflicted by Chesapeake's allegedly improper royalty calculations. Of course, Chesapeake would dispute such claims, but that does not vitiate such alleged claims. And because the claimed injuries arose *after* the discharge date, they remain extant and provide each class plaintiff with a concrete, monetary stake in the outcome of this proceeding.[6]

Finally, the class members' allegations encompass imminent future harms and seek injunctive relief requiring Chesapeake to calculate royalties in the manner they allege was required by their leases. *See* Class Action Complaint at 17, *Demchak*, No. 13-2289 (M.D. Pa. Aug. 30, 2013) (requesting order "enjoining Defendant from pursuing the policies, acts and practices described in this Complaint"); Amended Class Action Complaint at 33, *Brown*, No. 14-00591 (M.D. Pa. Aug. 22, 2014) (asking court to "[e]njoin Defendants from continuing their unlawful scheme"); Class Action Complaint at 38, *Suessenbach*, No. 14-01197 (M.D. Pa. June 20, 2014)

---

[6]    Class plaintiffs retain this concrete, monetary stake notwithstanding the Pennsylvania AG Settlement. As noted, the Pennsylvania AG Settlement provides leaseholders with a choice between having royalties calculated based on the in-basin index price and the netback price. ROA.1318-1319. Before any such election and implementation, alleged post-discharge damages accrue in the same manner as pre-discharge damages would have. After any election and implementation, alleged damages accrue based on the difference between the calculation method that class plaintiffs alleged to be proper in their complaints and the calculation methods provided for by the Pennsylvania AG settlement.

(requesting that "Defendants be enjoined from the conduct challenged herein").

These alleged future injuries were unaffected by any discharge of pre-bankruptcy

claims, as all gas leases and royalty obligations rode through the bankruptcy

unimpaired. ROA.648. Class plaintiffs' interest in securing forward-looking relief

thus remains wholly intact and provides each plaintiff with a concrete, personal stake

in the outcome of this proceeding.[7]

## II.    The Courts Below Had Subject-Matter Jurisdiction.

Objectors contend that the bankruptcy court and district court lacked subject-

matter jurisdiction over the settlement proceedings. That argument is meritless, as

the courts below had jurisdiction on either of two grounds. First, the courts below

had "arising in" jurisdiction. 28 U.S.C. §1334(b). The settlement agreements

---

[7] Objectors repeatedly invoke a letter that Chesapeake's counsel sent to counsel for a group of leaseholders who opted out of the proposed *Demchak* settlement, filed their own duplicative class action, and then opted out of the MEC Settlement. *See, e.g.*, Br. for Appellants at 12-13, 33, 36; *see Tyler v. Chesapeake Appalachia, LLC*, No. 16-cv-456 (M.D. Pa.). In relevant part, the letter states that any pre-bankruptcy claims for which no proof of claim is filed are "discharged and there is nothing further to pursue in any forum." ROA.2731-2733. This letter does not bolster Objectors' argument. To begin with, the letter did not purport to (and could not) alter the Plan provisions that allow for the possibility of late-filed claims. ROA.658. At most, it communicated that Chesapeake would not likely consent to late-filed claims by the *Tyler* opt-out plaintiffs, but nothing in it would (or could) foreclose Chesapeake from consenting to late-filed claims by other plaintiffs, like the named plaintiffs here. Furthermore, as explained, the fact that plaintiffs who failed to file proofs of claim for past injuries had their claims "discharged" with "nothing further to pursue in any forum" speaks only to plaintiffs' inability to obtain a *remedy* for those pre-discharge injuries; it does not *eliminate* those injuries (nor even address post-discharge injuries) and thus does not deprive those plaintiffs of standing.

definitively resolve claims filed in the bankruptcy case and are therefore core proceedings within the bankruptcy court's and district court's "arising in" jurisdiction. Second, the courts below also had "related to" jurisdiction. *Id.* While district courts and bankruptcy courts generally lack jurisdiction over post-confirmation disputes that wholly postdate confirmation and do not implicate the Plan, the proceedings here involve primary conduct that predates the bankruptcy, resolve litigation initiated before the bankruptcy, and could not be conducted without reference to the Plan and its effect on class members and other unsecured creditors. Chief Judge Rosenthal thus correctly held that these proceedings easily satisfy the applicable test for post-confirmation "related to" jurisdiction.[8]

Bankruptcy jurisdiction is grounded in statute. *Celotex Corp. v. Edwards*, 514 U.S. 300, 307 (1995). The general grant of bankruptcy jurisdiction is in 28 U.S.C. §1334, which establishes two main categories of bankruptcy matters over which the district courts have jurisdiction. First, 28 U.S.C. §1334(a) provides that district courts have jurisdiction over "all cases under title 11," which refers to the bankruptcy petition itself. *See* 1 Collier on Bankruptcy ¶3.01 (16th ed. 2022). Second, 28 U.S.C. §1334(b) provides that district courts have jurisdiction over civil proceedings "arising under title 11," "arising in … cases under title 11," or "related to cases under

---

[8] This Court examines questions of subject-matter jurisdiction *de novo*. *Borden v. Allstate Ins. Co.*, 589 F.3d 168, 170 (5th Cir. 2009).

title 11." For purposes of §1334(b), the word "proceeding" is used "in its broadest sense," such that "anything that occurs within a case is a proceeding." *In re U.S. Brass Corp.*, 301 F.3d 296, 304 n.14 (5th Cir. 2002). The district courts may, in turn, refer "any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11 ... to the bankruptcy judges for the district." 28 U.S.C. §157(a).

The courts below had both "arising in" and "related to" jurisdiction over the settlement proceedings. Proceedings that "aris[e] in … cases under title 11" are those "that are not based on any right expressly created by title 11, but nevertheless, would have no existence outside of the bankruptcy." *In re Wood*, 825 F.2d 90, 97 (5th Cir. 1987). The filing and resolution of a proof of claim is a proceeding that "arise[s] in" the bankruptcy case. *Id.* Indeed, Congress expressly designated proceedings regarding "allowance or disallowance of claims" as "core" proceedings, 28 U.S.C. §157(b)(2)(B), and "core proceedings are those that arise in a bankruptcy case or under Title 11." *Stern v. Marshall*, 564 U.S. 462, 476 (2011). Proceedings concerning the bankruptcy court's approval of an agreement to settle claims filed in the bankruptcy case are likewise core "arising in" proceedings. *See* Fed. R. Bankr. P. 9019 ("[T]he court may approve a compromise or settlement."); *see also Protective Comm. for Indep. Stockholders of TMT Trailer Ferry v. Anderson*, 390 U.S. 414, 424 (1968) ("In administering reorganization proceedings in an

economical and practical manner it will often be wise to arrange the settlement of claims as to which there are substantial and reasonable doubts.").

The proceedings here are core proceedings that "aris[e] in" the bankruptcy case because the settlement agreements definitively resolve claims filed in the bankruptcy case. While the named plaintiffs did not file proofs of claim, 161 members of the two classes did file proofs of claim, ROA.2824, and the settlement agreements will definitively resolve those claims for all claimants who do not opt out of the settlement, ROA.1342. The settlement agreements likewise will permanently extinguish the potential claims of all other class members, who otherwise could still seek to file late claims. *See supra*. In particular, both settlements provide that "any claims (as defined by section 101(5) of the Bankruptcy Code) against Chesapeake held by such Plaintiffs or Settlement Class Members shall be deemed satisfied and released and any Settled Claims filed in the Bankruptcy Cases shall be discharged and expunged from the claims registrar without any further order of the Bankruptcy Court." ROA.1342 (MEC Settlement); ROA.1402 (Non-MEC Settlement). Because final approval of the settlement agreements will resolve claims filed by class members in the bankruptcy—claims that otherwise would have to be resolved by the bankruptcy court during the claims reconciliation process—the courts below had "arising in" jurisdiction to approve the settlements, thereby

resolving those claims. As the bankruptcy court put it at the settlement conference, "[t]he claims give me all the jurisdiction I need." ROA.1602.[9]

Even setting aside the fact that the settlements resolved claims arising in the bankruptcy, the courts below also had "related to" jurisdiction, as Chief Judge Rosenthal correctly held.[10] The "related to" jurisdiction provided by §1334(b) is expansive, as "Congress intended to grant comprehensive jurisdiction to the bankruptcy courts so that they might deal efficiently and expeditiously with all matters connected with the bankruptcy estate." *Celotex Corp. v. Edwards*, 514 U.S. 300, 308 (1995). Before confirmation, a proceeding is "related to" the bankruptcy whenever "the outcome of that proceeding could *conceivably* have any effect on the estate being administered in bankruptcy." *In re Wood*, 825 F.2d 90, 93 (5th Cir. 1987) (quoting *Pacor, Inc. v. Higgins,* 743 F.2d 984, 994 (3rd Cir. 1984)). "Certainty, or even likelihood of such an effect is not a requirement." *Arnold v. Garlock, Inc.*, 278 F.3d 426, 434 (5th Cir. 2001).

---

[9] Because "related to" jurisdiction is more expansive than "arising in" jurisdiction, *In re Zale Corp.*, 62 F.3d 746, 751-52 (5th Cir. 1995), the courts below also had "related to" jurisdiction based on the settlement agreement's resolution of claims filed in the bankruptcy.

[10] Because she determined that the bankruptcy court had "related to" jurisdiction, Chief Judge Rosenthal did not need to consider whether it also had "arising in" jurisdiction. *See In re Zale Corp.*, 62 F.3d at 751-52 ("[T]o ascertain whether jurisdiction exists, 'it is necessary only to determine whether a matter is at least "related to" the bankruptcy.'").

While the text of 28 U.S.C. §1334(b) does not distinguish between pre- and post-confirmation jurisdiction, this Court has held that "related to" jurisdiction diminishes after confirmation. The post-confirmation debtor is meant to return to normal operations, with wholly post-confirmation disputes resolved in the normal course in state court or district court. *See In re Craig's Stores of Tex., Inc.*, 266 F.3d 388, 390 (5th Cir. 2001). This Court has identified three factors to consider when evaluating whether the bankruptcy court's "related to" jurisdiction encompasses post-confirmation proceedings: (1) whether the proceedings arise from pre-confirmation or post-confirmation relations between the parties, (2) whether antagonism between the parties was pending as of the date of confirmation, and (3) whether facts or law deriving from the reorganization or the plan are necessary to the proceedings. *In re Enron Corp. Sec.*, 535 F.3d 325, 335 (5th Cir. 2008) (citing *Craig's Stores*, 266 F.3d at 390). If the "first two *Craig's Stores* factors weigh heavily in favor of federal jurisdiction," the bankruptcy court has jurisdiction without regard to the third factor. *Id.* at 336.

Chief Judge Rosenthal correctly found these factors satisfied here. First, the settlement addresses relations that arose before confirmation. The leases at issue in these disputes were signed many years before Chesapeake declared bankruptcy and many years before confirmation. For example, the named plaintiffs in the *Demchak*, *Brown*, and *Suessenbach* class actions signed their leases between 2006 and 2009—

*i.e.*, 12-15 years before confirmation, which occurred in January 2021. *See, e.g.*, Exhibit C to Class Action Complaint, *Demchak*, No. 13-2289 (M.D. Pa. Aug. 30, 2013) (2006 lease).

Second, the antagonism between the parties to the settlement agreements arose long before confirmation: "The Pennsylvania oil-and-gas litigation arose seven years before Chesapeake declared bankruptcy." ROA.2900. In particular, the *Demchak* complaint was filed in 2013, and the *Brown* and *Suessenbach* complaints in 2014. That antagonism, moreover, was pending as of the date of confirmation. The settlements here provide a final resolution to those pre-confirmation disputes.

Because the first two factors "weigh heavily in favor of federal jurisdiction," the inquiry can end there. *See In re Enron*, 535 F.3d at 336. But the third *Craig's Stores* factor is satisfied as well. As Chief Judge Rosenthal's analysis reflects, the settlements' compliance with Rule 23(e) must be assessed in conjunction with the Plan, the relief provided to other unsecured creditors, and the relief that would be available to class members absent the settlements. *See, e.g.*, ROA.2850 (finding settlements fair in part because they "are the most practical vehicle for recovery for most of the class members" in light of the bankruptcy); *see also* ROA.2847-2850. Furthermore, as Chief Judge Rosenthal recognized, "the settlements will affect the debtors' postconfirmation rights and responsibilities under each oil-and-gas lease." ROA.2831; *cf. In re U.S. Brass*, 301 F.3d at 305 (affirming jurisdiction over post-

confirmation settlement in part because the "outcome could affect the parties' post-confirmation rights and responsibilities"). All three *Craig's Stores* factors are therefore satisfied.

Chief Judge Rosenthal identified additional factors that courts have analyzed when determining whether a court has post-confirmation jurisdiction over a dispute, ROA.2830, and she correctly concluded that these factors are satisfied here as well, ROA.2831. In particular, she explained that "[t]he debtors' confirmation plan is not fully consummated," "[t]he debtor, not a third party, is the defendant in the litigation," "[t]he parties have moved for final approval of their settlement agreements in the bankruptcy court," and "[t]he confirmation order here makes clear that the bankruptcy court retained 'exclusive jurisdiction over all matters arising out of, or relating to, the Chapter 11 Cases and the Plan,' including jurisdiction to … enter and implement such orders as may be necessary to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created or entered into in connection with the Plan." ROA.2831.

Objectors do not dispute any of Chief Judge Rosenthal's findings or claim that the framework she applied was legally flawed in any respect. Instead, Objectors simply repeat *ad nauseam* that the settlements were entered into after confirmation and act as if that fact automatically deprived the bankruptcy court and district court

of jurisdiction to approve the settlements.  *See* Br. for Appellants at 38-43.  That is not the law.  While post-confirmation "related to" jurisdiction is less expansive than pre-confirmation "related to" jurisdiction, it by no means disappears.  Instead, as explained above, this Court applies the *Craig's Stores* factors to assess jurisdiction, *In re Enron*, 535 F.3d at 335, just as Chief Judge Rosenthal did below.  Tellingly, Objectors fail to acknowledge the existence of these factors, fail to explain how those factors could possibly cut against jurisdiction here, and fail to proffer any alternative test.  In short, Objectors' argument seems to rest on the premise that bankruptcy courts and district courts have *no* "related to" jurisdiction after plan confirmation— a premise that is manifestly wrong and conflicts with this Court's cases.

Objectors fare no better in accusing Chief Judge Rosenthal of "ignor[ing] that the Settlements did not exist before the Effective Date, were not pending on the Effective Date, and were not addressed in the Plan."  Br. for Appellants at 41.  That is nonsense.  If Chief Judge Rosenthal actually "ignored" those things—all of which are just different ways of saying that the settlements arose post-confirmation—she would have simply applied the "conceivable effect" test that applies to pre-confirmation proceedings.  It was precisely because she *did not* ignore the settlements' post-confirmation date that she instead properly applied the *Craig's Stores* test for "determining whether a court retains *postconfirmation* subject-matter jurisdiction over a dispute."  ROA.2830 (emphasis added).

Objectors criticize Chief Judge Rosenthal's reliance on *In re United States Brass Corp.*, 301 F.3d 296 (5th Cir. 2002), but that case provides a close and helpful analogue to this one. In *U.S. Brass*, as here, the debtor and its creditors asked the bankruptcy court to approve a post-confirmation settlement addressing a dispute that arose before confirmation. This Court applied the *Craig's Stores* test and affirmed the bankruptcy court's and district court's post-confirmation jurisdiction, noting that the dispute arose before the bankruptcy, that the plan "has not been fully consummated," that determining whether to approve the settlement would require reference to the Plan, and that "the outcome [of the dispute] could affect the parties' postconfirmation rights and responsibilities." *Id.* at 305. Likewise here, the dispute arose long before the bankruptcy, the plan has not been fully consummated, determining whether to approve the settlement requires consideration of the Plan and the relief that would be available to class members absent the settlements, and "the settlements will affect the debtors' postconfirmation rights and responsibilities under each oil-and-gas lease." ROA.2831.[11]

---

[11] Objectors' description of *U.S. Brass* is inaccurate in multiple respects. Objectors state that this Court "found that the bankruptcy court and district court erred" by declining to exercise jurisdiction. Br. for Appellants at 42. In reality, all three courts agreed that they had post-confirmation jurisdiction over the settlement proceedings. *See U.S. Brass*, 301 F.3d at 299. Objectors state that *U.S. Brass* deemed the proposed settlement "fully consistent with the plan," Br. for Appellants at 42, but this Court in fact held the opposite, ruling that the settlement was

In contrast, this case is entirely unlike the cases in which this Court has found jurisdiction lacking and on which Objectors rely.  In *Craig's Stores* itself, for example, the debtor filed for bankruptcy in 1993 and its reorganization plan was confirmed in December 1994, yet it asked the bankruptcy court to resolve a lawsuit it filed "in mid-1996 … asserting state law claims for damages alleged to have arisen in 1994 and 1995." *Craig's Stores*, 266 F.3d at 389.  This Court found jurisdiction lacking for reasons that do not apply here—namely, because the debtor's lawsuit "principally dealt with post-confirmation relations between the parties," "[t]here was no antagonism or claim pending between the parties as of the date of the reorganization," and the lawsuit could be resolved without reference to any "facts or law deriving from the reorganization or the plan." *Id.* at 391; *see also* Br. for Appellants at 39 (citing *In re In Play Membership Golf, Inc.*, 576 B.R. 15, 21 (Bankr. D. Colo. 2017) (no jurisdiction over post-confirmation dispute between debtor and management company it hired after filing for bankruptcy)).

In sum, the proceedings below—which approved class settlements that resolve claims filed in the bankruptcy, conclude litigation that began almost a decade

---

*inconsistent* with the plan and affirming the lower courts' refusal to approve it, *U.S. Brass*, 301 F.3d at 309.

before the bankruptcy, and whose fairness can be judged only in relation to the bankruptcy—either "aris[e] in" or are "related to" Chesapeake's bankruptcy.[12]

## III.    The Settlements Comply With Rule 23.

Chesapeake joins the Rule 23 arguments set forth in the briefs filed by the MEC and Non-MEC classes.  Chesapeake briefly addresses this topic separately to provide additional perspective as the reorganized debtors in the bankruptcy proceedings and the only party to both settlements at issue here and the settlement with the Pennsylvania Attorney General.  Together, these settlements resolve more than eight years of litigation over alleged oil-and-gas royalty underpayments in Pennsylvania and effectuate Chesapeake's overarching goal of resetting and enhancing its relationship with Pennsylvania landowners and regulators.  Objectors' various attempts to derail the settlement under Rule 23 suffer from the same basic flaw:  their refusal to accept that Chesapeake's bankruptcy altered the landscape and

---

[12]   Objectors briefly suggest that "the lower courts should have abstained from considering the settlements" under the permissive abstention provision at 28 U.S.C. §1334(c)(1).  Br. for Appellants at 43; *see* ROA.2508 (district court brief raising only permissive abstention).   The district court's decision not to abstain under §1334(c)(1) is not reviewable in this Court:  "Any decision to abstain or not to abstain made under subsection (c) (other than a decision not to abstain in a proceeding described in subsection (c)(2)) is not reviewable by appeal."  28 U.S.C. §1334(d); *see* 1 Collier on Bankruptcy ¶3.05 ("[A] decision not to abstain under discretionary abstention may not be appealed to a court of appeals or the Supreme Court.").  In all events, Chief Judge Rosenthal did not abuse her broad discretion by declining to abstain.  *See* ROA.2901-2902 n.2; *see also In re Galaz*, 841 F.3d 316, 323-24 (5th Cir. 2016) (noting abuse-of-discretion standard).

necessitated reasonable changes to the preliminary settlement agreements in the *Demchak* and *Brown-Suessenbach* litigation, while still providing equivalent or better value.  Because the settlements represent a substantial and favorable outcome for the classes, and because they comply with Rule 23 in all respects, Chief Judge Rosenthal correctly granted final approval.[13]

First, Objectors argue that the MEC Settlement impermissibly required royalty owners who opted out of the *Demchak* settlement to also opt out of the settlement here.  As Chief Judge Rosenthal explained, that argument fails to appreciate that anyone who opted out of the *Demchak* settlement but did not file a proof of claim in the bankruptcy would lose the option to pursue individual claims for past royalties that they thought they had preserved by opting out of the *Demchak* settlement.  ROA.2861.  The purpose of the opt-out right is to protect a class member's ability to "litigate it on his own," *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 813 (1985), and those who opted out of the *Demchak* settlement presumably did so to preserve that go-it-alone option.  But because of Chesapeake's bankruptcy, being excluded from the MEC Settlement would have the opposite effect—*i.e.*, it would foreclose the go-it-alone option.  Because of those "new,

---

[13] The abuse-of-discretion standard governs this court's review the district court's approval of the settlement under Rule 23.  This court exercises *de novo* review as to whether the district court applied the correct legal standard.  *In re Deepwater Horizon*, 739 F.3d 790, 798 (5th Cir. 2014).

harsher consequences" of opting out, "[a] new round of notice and opportunity to opt out were necessary to ensure that the class members understood that their prebankruptcy claims were extinguished." ROA.2863-2864. Indeed, if anything raised due-process concerns, it would be Objectors' proposal of automatically excluding the *Demchak* opt-outs from these class settlements, which would extinguish their claims for pre-bankruptcy damages without any notice or opportunity to join the class.

Second, Objectors take issue with the lower courts' preliminary approval of the settlements and authorization of notice to the classes. This argument should be rejected at the threshold because the question of preliminary approval is now moot. The question at the preliminary approval stage is whether "the court will likely be able to" finally approve the settlement and certify the class. Fed. R. Civ. P. 23(e)(1)(B). Whether the court is *likely* to grant final approval and certify the class is now moot, as the court has *in fact* granted final approval and certified the class. *Cf. Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 314 (1999) ("Generally, an appeal from the grant of a preliminary injunction becomes moot when the trial court enters a permanent injunction, because the former merges into the latter."). Furthermore, the class notices authorized by the preliminary approval order have already been sent and received by the class members. Objectors are free to (and do) challenge the district court's final fairness

and certification determinations, but their challenge to the preliminary approval order is moot.

In all events, their arguments regarding preliminary approval have no merit. Objectors principally argue that the *bankruptcy court* ignored or misapplied the 2018 amendments to Rule 23(e).[14] That is not only wrong but irrelevant, as the order on review is the district court's order granting preliminary approval, not the bankruptcy court's order.  In the actual order on review, Chief Judge Rosenthal set forth and applied Rule 23(e)'s requirements carefully and correctly, concluding that "[t]he settling parties submitted each type of evidence listed in the 2018 Committee Notes," ROA.1838, and that the settlement terms were "fair, reasonable, and adequate based on the current record," ROA.1842; *see also* ROA.1828-1829, ROA.1836-1842.[15] More broadly, Objectors' claim that the record was insufficiently developed for preliminary approval ignores the lengthy history of this case, the years of mediation and litigation among Chesapeake, class counsel, and the Pennsylvania Attorney

---

[14]  Objectors overstate the impact of the 2018 Amendments, which "essentially codified … prior practice" and are "unlikely to generate a significant change in the settlement process or outcome." 4 Newberg on Class Actions §13:13 (5th ed. 2021).

[15]  Objectors assert that the lower courts "incorrectly presumed fairness as a starting point," Br. for Appellants at 45, but do not cite any statement by either court suggesting they applied any such presumption of fairness to the settlement terms. Objectors' only citation is to a statement in the district court's final approval order that it may presume "no fraud or collusion" between defendant and class counsel "in the absence of any evidence to the contrary," ROA.2846, which is an accurate statement of the law.

General (who approves of these settlements, ROA.1842), and the extensive proceedings in the Middle District of Pennsylvania that preceded Chesapeake's bankruptcy. *See* ROA.1838-42; *see also* ROA.2846 (noting "the many hearings in the Middle District of Pennsylvania and the Southern District of Texas bankruptcy court, several mediations with experienced mediators, the involvement of the Pennsylvania Attorney General, and lengthy, difficult negotiations"). It is the rare class-action settlement that has a *more* developed record than this one, and Chief Judge Rosenthal did not abuse her discretion by granting preliminary approval.[16]

Third, while Objectors do not appear to be challenging the district court's substantive determination that the settlements are fair, reasonable, and adequate, *see* ROA.2857, they do occasionally suggest that the terms of these settlements are not as favorable as those proposed in the pre-bankruptcy *Demchak* and *Brown-Suessenbach* cases. Even if that premise were true, and even if that were a relevant comparison,[17] any differences would be entirely explainable by Chesapeake's

---

[16] Objectors complain that "Chesapeake, and not the named plaintiffs, was the only movant asking for permission to send notice to the class." Br. for Appellants at 49. Chesapeake alone filed the motion for approval because Rule 9019(a) authorizes only "the 'trustee,' which includes a debtor in possession in a chapter 11 case, to seek an order approving a compromise or settlement." 10 Collier on Bankruptcy ¶9019.01.

[17] The Federal Rules require a comparison between the proposed settlement and "the likely rewards the class would have received following a successful trial of the case," *Reed v. Gen. Motors Corp.*, 703 F.2d 170, 172 (5th Cir. 1983), not between

intervening bankruptcy, which substantially reduced the value of the class members' backward-looking claims. *See* ROA.2821. Furthermore, Chesapeake must treat all of its unsecured creditors comparably, limiting the amount it can pay to each class member without running afoul of that "fundamental principle of the bankruptcy law." *Kaufman Cnty. Levee Improvement Dist. No. 4 v. Mitchell*, 116 F.2d 959, 960 (5th Cir. 1941). It would therefore be no surprise and no problem if the settlements here were less valuable than the proposed pre-bankruptcy settlements.

In all events, the premise is not true. While the settlements provide less immediate monetary relief than the proposed *Demchak* and *Brown-Suessenbach* settlements, they provide forward-looking relief that is far more valuable than that proposed in the prior settlements. As Chief Judge Rosenthal put it, "[t]he reduced cash is offset by the increased injunctive relief." ROA.2855. The MEC Settlement provides class members with the higher of the in-basin index or netback price each month, and the Non-MEC Settlement allows class members to make a one-time choice between those same methods. ROA.2824-2825. Contrary to Objectors' assertion that "[t]here has been no effort to … show that the going-forward changes quantifiably are beneficial to all class members … in comparison to the pre-existing terms," Br. for Appellants 62, both sides offered expert analyses regarding the value

the proposed settlement and an entirely different, years-old settlement negotiated in a different case, years before the bankruptcy, and never finalized.

of these forward-looking provisions. *See* ROA.2850-55. Weighing that evidence, Chief Judge Rosenthal concluded that "the middle-band value of the injunctive relief [for the MEC class] over the next 10 years ranges from \$49,575,730 to \$42,216,165" and the "upper band range across 10 years is \$86,974,280 to \$65,980,218," both of which "are improvements over the netback method and the previous settlement's 66% deduction method." ROA.2854. With respect to the Non-MEC Settlement, Chief Judge Rosenthal explained that it "allows the Non-MEC class members to base their future royalties on the in-basin index price, which is calculated without deducting the allegedly inflated post-production costs that sparked the initial lawsuit" and thus "will benefit the Non-MEC class members in a similar way." ROA.2854-2855.

*    *    *

After many years of negotiation and litigation, after twists and turns including Chapter 11 bankruptcy, the parties have reached settlements that provide substantial immediate and long-term relief to the two classes. The settlements are the product of "rigorous, hard-fought negotiations conducted at arm's length," "many hearings in the Middle District of Pennsylvania and the Southern District of Texas bankruptcy court, several mediations with experienced mediators, the involvement of the Pennsylvania Attorney General, and lengthy, difficult negotiations." ROA.2915. The settlement terms are fair, reasonable, and adequate—and then some. Indeed,

Chief Judge Rosenthal determined that *all eight factors* that apply under Rule 23(e)(2) and this Court's *Reed* decision are easily satisfied here. ROA.2915-2926. In short, these settlements check every conceivable box, ensuring a mutually productive and transparent relationship between Chesapeake and Pennsylvania landowners. There is no reason to delay that relief any longer.

## CONCLUSION

For the foregoing reasons, the Court should affirm.

Respectfully submitted,

s/George W. Hicks, Jr.
GEORGE W. HICKS, JR.
 *Counsel of Record*
DANIEL T. DONOVAN
AARON L. NIELSON
MICHAEL D. LIEBERMAN
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue NW
Washington, DC 20004
(202) 879-5000
george.hicks@kirkland.com

*Counsel for Appellee Chesapeake Energy Corporation*

April 27, 2022

## CERTIFICATE OF SERVICE

I hereby certify that on April 27, 2022, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the CM/ECF system.  I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

<u>s/ George W. Hicks, Jr.</u>
George W. Hicks, Jr.

## CERTIFICATE OF COMPLIANCE

I certify that:

1) This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B), because it contains 10,099 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Circuit Rule 32.2.

2) This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and Circuit Rule 32.1 and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point font.

3) Any required privacy redactions have been made pursuant to Circuit Rule 25.2.13, the electronic submission is an exact copy of the paper submission, and the brief has been scanned for viruses using Windows Defender and is free of viruses.

April 27, 2022

<u>s/George W. Hicks, Jr.</u>
George W. Hicks, Jr.